2002 SD 86

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Harold RUNNING BIRD, Defendant and Appellant.**

**No. 22023.**

Supreme Court of South Dakota.

Considered on Briefs March 25, 2002.

Decided July 24, 2002.

Mark Barnett, Attorney General, John M. Strohman, Assistant Attorney General, Pierre, for plaintiff and appellee.

Michael Stonefield, Paula D. Camp, Office of Public Defender for Pennington County, Rapid City, for defendant and appellant.

GORS, Acting Justice.

[¶ 1.] Harold Running Bird (Running Bird) appeals a final judgment of conviction for kidnapping and second degree rape. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] In August of 2000, Katinka Stegeman (Katinka) traveled to Rapid City, South Dakota from Holland. She was twenty-four years old, and came to South Dakota to learn more about the Native American culture.

[¶ 3.] On August 13, Katinka went to the Pennington County fairgrounds and met Harold Running Bird (Running Bird) and Edna Eagleman (Edna). The three drank beer together and later went shopping for a sleeping bag and tent for Katinka. Katinka also purchased more beer to share with a group of other Native Americans she had met at the fairgrounds. Running Bird, Edna and Katinka returned to the fairgrounds around 11:00 p.m. Shortly thereafter, Running Bird helped Katinka put up her tent. Katinka then placed her belongings in her tent, said goodnight to the group, and went to sleep in her tent.

[¶ 4.] Later in the evening, Running Bird entered Katinka's tent. She asked him to leave, and he refused, so she left her tent and walked to the restroom. Katinka stayed in the restroom for one half hour to forty-five minutes. When she returned to her tent, her sleeping bag and all of her personal belongings were gone. This included her two backpacks, which contained her coat, wallet, insurance card, railroad pass, bank card, Dutch money, and telephone card.

[¶ 5.] Upon realizing all of her property was gone, she looked up and saw Running Bird coming towards her. Running Bird told Katinka that he and Edna had moved their campsite and packed up Katinka's belongings. Running Bird then helped Katinka take her tent down, and together they walked to the new campsite, which was down by a creek.

[¶ 6.] As soon as they reached the campsite, Running Bird grabbed Katinka from behind and pushed her into some bushes. Edna then started pushing grass into Katinka's face. Running Bird threatened Katinka that if she did not obey his commands, he would drown her in the creek. Running Bird then rolled Katinka on her back, pulled up her shirt, and fondled her breasts. He then removed her pants by breaking her zipper. Katinka screamed for help, which resulted in Running Bird hitting her in the left eye with his fist. Running Bird then pushed his finger into her vagina and made unsuccessful attempts to enter her vagina with his penis. Subsequently, Running Bird again violated Katinka with his fingers. After a second unsuccessful attempt to enter her vagina with his penis, Running Bird forced his penis into Katinka's mouth.

[¶ 7.] Running Bird then turned to Edna who had lain down next to Katinka. He engaged in sexual acts with Edna. Katinka stayed because she was afraid to get up to leave. Running Bird then continued his attack on Katinka by performing oral sex on her. He then violated her vagina with his penis. Katinka described it as being "very painful." She began screaming as she felt her vagina tearing. Edna also sexually assaulted Katinka by biting her breasts and tongue, and sitting on Katinka's head in an attempt to force Katinka to perform oral sex.

[¶ 8.] After Running Bird ejaculated, he got dressed. Katinka also got dressed and began, unsuccessfully, to look for her cellular phone. She then started searching for her original campsite, and in the process she found a police car, which Officer Trent Pettis was driving. Officer Pettis testified that as Katinka approached the police car she was "hysterical" and screaming while waving her arms. He also noticed red marks on her face. Katinka was speaking with an accent, but Officer Pettis understood her to be saying "rape." He then drove her to the hospital.

[¶ 9.] At the hospital Katinka met nurse Leah Walker (Walker). Walker examined Katinka and found scratches and abrasions on her back. Katinka also had bruising and swelling on her face, dried blood in her nose, a laceration on her tongue, and a bruise on her breast.

[¶ 10.] Dr. Raymond Burnett, an obstetrician and gynecologist, also examined Katinka. Dr. Burnett testified that when he first saw Katinka, he thought she had been in a fight since she had bruises on her face and her vagina was bleeding. As a result of her injuries, Dr. Burnett put her under anesthesia to surgically repair her vagina. Katinka had suffered a tear down the midline of her hymen "across the soft tissue called the introitus and down on the skin between the vagina and the anus." She also suffered two other tears in that area. Dr. Burnett needed to use sutures on two of the three tears.

[¶ 11.] Running Bird was eventually located at a construction work site in Box Elder. He was taken to Rapid City and was interviewed by Officer Brian Mueller (Officer Mueller). Additionally, Running Bird's car was searched and seized. In the car police found Katinka's belongings.

[¶ 12.] Running Bird was charged with second-degree rape, simple assault, and two counts of kidnapping. A jury trial was held on February 26–28, 2001. The jury was unable to reach a verdict, and a mistrial was declared. A retrial commenced on April 23, 2001.

[¶ 13.] At the retrial Dr. Burnett testified as to Katinka's injuries. He stated, "it's my medical opinion that from my past experience and from seeing the way this woman presented herself, that this was a traumatic episode of intercourse." He did not give an opinion on whether the intercourse was consensual or nonconsensual, but only as to the forcefulness of the sexual act. Additionally, the interview between Running Bird and Officer Mueller was videotape recorded, played for the jury and introduced (over objection) as an exhibit.

[¶ 14.] At the conclusion of the State's case, Running Bird made a motion for judgment of acquittal for the kidnapping counts. The trial court denied this motion. Running Bird renewed the motion at the conclusion of his own case, which again was denied. The jury returned guilty verdicts for second degree rape and kidnapping. The trial court sentenced Running Bird to serve 75 years in prison on the kidnapping conviction and 25 years in prison on the rape conviction, with sentences to be consecutive.[1]

[¶ 15.] Running Bird appeals on the following issues:

(1) Whether the trial court should have granted Running Bird's motions for judgment of acquittal on the kidnapping charges.

(2) Whether the trial court should have given Running Bird's proposed jury instructions.

---

1. The simple assault charge was not submitted to the jury.

(3) Whether the videotaped interview of Running Bird by Officer Mueller was erroneously admitted into evidence.

(4) Whether the trial court should have allowed Dr. Burnett's testimony that Katinka's injuries resulted from a "traumatic episode of intercourse."

## ANALYSIS AND DECISION

[¶ 16.] **1. Whether the trial court should have allowed Running Bird's motions for judgment of acquittal on the kidnapping charges.**

[¶ 17.] Running Bird was charged with kidnapping in violation of SDCL 22–19–1(2) and 22–19–1(3). Both counts alleged that Running Bird seized, confined, inveigled, decoyed, abducted, or carried away Katinka, and held or detained her. Count I charged that the kidnapping was done to facilitate the commission of any felony or flight thereafter (SDCL 22–19–1(2)), while Count II charged that the kidnapping was done to inflict injury on, or to terrorize Katinka (SDCL 22–19–1(3)).[2]

[¶ 18.] At the conclusion of both the State's case and Running Bird's case, Running Bird made a motion for judgment of acquittal on the kidnapping counts. The trial court denied both motions.

[¶ 19.] Our standard of review is well established:

> The standard of review for denial of a motion for judgment of acquittal is whether the "evidence was sufficient to sustain the convictions." "When reviewing sufficiency of the evidence, this [C]ourt, considers the evidence in a light most favorable to the verdict." "A guilty verdict will not be set aside if the

state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." "We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence."

*State v. Verhoef,* 2001 SD 58, ¶ 22, 627 N.W.2d 437, 442 (internal citations omitted).

[¶ 20.] Running Bird claims that the kidnapping charges are invalid because the only confinement of Katinka occurred during the rape. He argues Katinka willingly and voluntarily walked with him to the new campsite where the rape occurred. Running Bird further contends that, under the *Curtis/Reiman* test, the confinement was merely incidental to the rape.

[¶ 21.] The *Curtis/Reiman* test has its origin in *State v. Reiman,* 284 N.W.2d 860 (S.D.1979). In *Reiman,* two men abducted a woman from a parking lot and took her to a building. At the building they were joined by two other men. All four men raped the woman. This Court determined that two of the four co-defendants could not be charged with kidnapping since their acts of confinement were restricted to holding the victim down on a mattress to facilitate the rape. We stated that "[w]e find it unreasonable to sustain a conviction for kidnapping which is unsupported by evidence aside from acts incidental only to another crime." *Id.* at 873. This Court explained that the two co-defendants' movement of the victim was merely incidental to the rape and did not substantially increase the risk of harm that was present. *Id.* at 873–74.

2. SDCL 22–19–1(2), (3) provides:
[a]ny person who shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person ... for any of the following reasons:

(2) To facilitate the commission of any felony or flight thereafter;
(3) To inflict bodily injury on or to terrorize the victim or another ... is guilty of kidnapping.

[¶ 22.] The next case discussing this subject was *State v. Curtis*, 298 N.W.2d 807 (S.D.1980). In *Curtis*, the defendant committed attempted murder during the course of a forced automobile ride. We found that the kidnapping was not incidental to the defendant's attempted murder, and affirmed the conviction. We stated, "it is clear that appellant did kidnap this person. The victim was confined in her automobile . . . for the apparent purpose of terrorizing or inflicting bodily injury on her." *Id.* at 810.

[¶ 23.] The *Curtis/Reiman* test was subsequently explored in *State v. St. Cloud*, 465 N.W.2d 177 (S.D.1991). In *St. Cloud*, the defendant forced his victim at knifepoint to drive him to a rural location where he raped her. We stated that no reasonable jury correctly applying the *Reiman/Curtis* test could have concluded that the defendant's kidnapping of the rape victim was merely incidental to the rape. *Id.* at 182. In *St. Cloud* we explained that under *Reiman* a kidnapping can be charged when "1) the kidnapping is not an essential element of some other clearly identified crime and 2) the victim is exposed to an increased risk of harm because of the kidnapping." *Id.* at 181. We acknowledged that where the kidnapping "consists of prolonged confinement or movement from one premises to another—even if only from a parked car to an abandoned house—then one and probably both prongs of the *Reiman/Curtis* test cannot be met and the kidnapping cannot be considered incidental to another crime." *Id.* We also noted that a kidnapping may be incidental to another crime "when the kidnapping consists either of confinement of minimal duration or of minimal movement within the same premises." *Id.*

[¶ 24.] Another interpretation of the *Curtis/Reiman* test was discussed in *State v. Lykken*, 484 N.W.2d 869 (S.D.1992). In *Lykken*, a woman was confined when the defendant locked her in the bedroom and repeatedly raped her at her home. We held that the confinement at her home was not merely incidental to the crime of rape. *Id.* at 876. We stated that the *Curtis/Reiman* test

> is not meant to allow a rapist a free kidnapping because he also commits a rape. It is meant to prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape. Such brief restraint does not normally increase the victim's risk of harm over and above that already inherent act in the rape.

*Id.* at 876.

[¶ 25.] Although we acknowledge that Katinka voluntarily walked with Running Bird to the site of the rape, she was "inveigled"[3] and "decoyed" into doing so. *See* SDCL 22–19–1. Katinka was a stranger in the United States. When she returned from the restroom, she found that Running Bird had taken all of her belongings. He told Katinka that he and Edna had moved her belongings to a new campsite. It was the middle of the night in a non-residential area. Katinka's only choice was to remain in the dark with no possessions, or go with Running Bird. He used her possessions to lure her to the campsite by the creek. Running Bird might as well have held a gun to her head.

[¶ 26.] In *St. Cloud* we stated that "most movement of rape victims by their attackers is designed to seclude the victim from possible assistance and to prevent escape—which inevitably increases the

---

**3.** Inveigle means "[t]o lure or entice or lead astray, by false representations or promises, or other deceitful means." Black's Law Dictionary 824 (6th ed 1990).

risk of harm to the victim." 465 N.W.2d at 181. Running Bird's movement of Katinka was clearly designed to seclude Katinka from assistance and escape. He did not take her belongings down to the campsite by the creek to get better accommodations or a better night's sleep or to protect her. He moved her possessions to get her away from everyone else so he could rape her. We therefore conclude that the kidnapping was not merely incidental to the rape. The kidnapping conviction is affirmed.

[¶ 27.] **2. Whether the trial court should have given Running Bird's proposed jury instructions.**

[¶ 28.] Running Bird proposed two jury instructions regarding kidnapping at the conclusion of the trial. The trial court refused his instructions. This Court has recently reaffirmed its standard of review concerning proposed jury instructions.

> We review a trial court's refusal of a proposed instruction under an abuse of discretion standard. "The trial court has broad discretion in instructing the jury." Jury instructions are satisfactory when, considered as a whole, they properly state the applicable law and inform the jury. Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice. Further, to reverse a conviction for failure to give a proposed instruction, the defendant must show that the jury would have returned a different verdict if the proposed instruction was given. Absent such a showing, the trial court will not be reversed.

*State v. Webster*, 2001 SD 141, ¶ 7, 637 N.W.2d 392, 394 (internal citations omitted).

[¶ 29.] Running Bird's first proposed instruction provided:

> The second element of the crime of kidnapping ... which is that the defendant did hold or detain Katinka Stegeman, requires an unlawful holding or detaining of Katinka Stegeman above and beyond the *holding or detaining which would have been necessary to commit the crime of rape.*

> If such an additional holding or detaining did not occur in this case, or if you find that the only *holding or detaining of Katinka Stegeman* by the defendant during the time period and events in question *was that necessary to commit the crime of rape* you must find the defendant not guilty of kidnapping.

(emphasis added). Running Bird's second proposed jury instruction provided:

> If you find from all of the evidence that the only *restraint* of the alleged victim utilized by the defendant during the time period and events in question *was such restraint as was necessary to complete the crime of rape,* then the crimes of kidnapping ... were not committed by the defendant. If so, you must acquit the defendant of kidnapping.

(emphasis added). Running Bird's proposed instructions are not accurate statements of the law. This Court has stated that neither movement nor prolonged confinement of a victim are essential elements to the crime of rape. *Lykken,* 484 N.W.2d at 876; *see also* SDCL 22–19–1(2)(3) (providing that any person who shall "inveigle" or "decoy" another person and detain such person in order to facilitate a rape or other felony or inflict bodily injury is guilty of kidnapping).

[¶ 30.] In Running Bird's case, he took Katinka's property and inveigled and decoyed her to a more secluded campsite in order to rape her. Since Running Bird's proposed instructions did not properly state the law, the trial court correctly refused the instructions.

**[¶ 31.] 3. Whether the videotaped interview of Running Bird by Officer Mueller was erroneously admitted into evidence.**

[¶ 32.] At trial, the State offered the videotaped interview between Officer Mueller and Running Bird into evidence. Running Bird objected, asserting that many of Mueller's questions and opinions on the videotape labeled Running Bird dishonest. The trial court admitted the videotape into evidence and cautioned the jury that the statements Officer Mueller made during the interview should not be considered as being true.

[¶ 33.] The trial court instructed the jury as follows:

> I will advise the jury in the course of this you'll be reviewing the video tape that has been testified to concerning the interview. Please bear in mind that nothing the officer says in the course of that interview is to be considered by you as a fact. The only things you're to consider in the course of the interview are what the defendant himself may have said in the course of that interview. The officer's statements are not relevant to the facts of the case, only to set the stage for the response of the defendant.

[¶ 34.] The standard of review for the admission of exhibits and documents is abuse of discretion. *State v. Larson*, 1998 SD 80, ¶¶ 28, 30, 582 N.W.2d 15, 21–22; *State v. Brown*, 480 N.W.2d 761, 763 (S.D. 1992).

[¶ 35.] Running Bird claims that Officer Mueller in essence gave his opinion as to Running Bird's credibility [4] via the videotape, something that Officer Mueller would not have been allowed to do through direct questioning. Officer Mueller did not testify. He was not asked any questions about Running Bird's honesty, and his statements and questions on the videotape do not constitute direct testimony. The trial court gave clear, cautionary instructions to the jury, and therefore the trial court did not abuse its discretion in admitting the videotape into evidence.

**[¶ 36.] 4. Whether the trial court should have allowed Dr. Burnett's testimony that Katinka's injuries resulted from a "traumatic episode of intercourse."**

[¶ 37.] At trial Dr. Burnett testified that "it's my medical opinion that from my past experience and from seeing the way this woman presented herself, that this was a traumatic episode of intercourse." Running Bird claims that Dr. Burnett's testimony that Katinka's injuries were the result of a traumatic episode of intercourse is, "in so many words," testimony that Katinka was raped.

[¶ 38.] A trial court's decision to admit expert testimony is controlled by SDCL 19–15–2, which provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This Court has stated that a doctor who does not give an opinion as to a defendant's guilt or innocence has not invaded the province of the jury. *State v. Well*, 2000

---

4. Some of Officer Mueller's comments include:

"Something pretty big happened last night and I think you've probably got a good idea as to why we're down here questioning you"; "We know it wasn't consensual as what you're saying"; "I think that you know deep down that this gal from Holland probably didn't want to go as far as things went either"; and "Well, we both know that didn't happen."

SD 156, ¶ 16, 620 N.W.2d 192, 195. We have also acknowledged that "[t]he trial court has broad discretion concerning the qualification of experts and the admission of expert testimony. The trial judge's decision as to such matters will not be reversed on appeal absent a clear showing of abuse of that discretion." *State v. Logue*, 372 N.W.2d 151, 156 (S.D.1985).

[¶ 39.] Dr. Burnett's testimony did not amount to an opinion as to Running Bird's guilt or innocence. On cross-examination, Dr. Burnett was asked if Katinka's vaginal injuries could have occurred during a consensual act. Dr. Burnett responded, "yes, I think that—that could be the case." Then, on redirect, the State asked the following:

Q: Why can't you say that this was the result of nonconsensual sex?

A: I can't.

Q: Why can't you say that? Why not?

A: When this occurred, there had to be more force used then I would expect in a normal, caring, consensual sexual act and—but I cannot say whether the woman consented originally or not. My opinion is that she didn't because of all the bruises and it looked like she was traumatized. But if an uncaring male started to have intercourse with a consenting female and got to a point where he just thrust forward and had no care about what was going on in her ... he could cause those tears.

In its next question, the State asked, "you don't know whether the act itself was consensual or nonconsensual because you weren't there?" Dr. Burnett replied, "[r]ight." First, the defendant's cross-examination on whether Katinka's injuries could have occurred from consensual sex invited the State's follow-up question. Second, an opinion may be given on an ultimate issue. SDCL 19-15-4; *State v. Guthrie*, 2001 SD 61, ¶ 31, 627 N.W.2d 401, 415.

[¶ 40.] The testimony shows that Dr. Burnett did not give an opinion as to Running Bird's guilt or innocence, only whether Katinka's injuries indicated consent. The admission of this testimony, therefore, was not an abuse of discretion and did not invade the province of the jury.

[¶ 41.] Affirmed.

[¶ 42.] GILBERTSON, Chief Justice, and SABERS, AMUNDSON, and KONENKAMP, Justices, concur.

[¶ 43.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.